UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **DESTRY CORD McKINNEY,** )   ) | |
| Petitioner, ) ) | |
| v. ) ) | Case No.: 1:17-cv-0713-RDP-GMB |
| **WARDEN LEON BOLLING, et al.,** ) ) | |
| Respondents. ) | |

## MEMORANDUM OPINION

Destry Cord McKinney ("Petitioner" or "McKinney"), a person in custody under a judgment of a court of Alabama, filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). Petitioner challenges his 2004 conviction for capital murder in the Circuit Court of Talladega County, Alabama. (*Id*. at 1). In response to the Magistrate Judge's order to show cause, Respondents filed an answer, and Petitioner thereafter filed a reply. (Docs. 4, 10, 14). Accordingly, this matter is ripe for adjudication. For the reasons that follow, Petitioner's claims are due to be denied.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

**A.    Trial and Direct Appeal**

On February 6, 2000, McKinney shot and killed Stevelynn Seals after an altercation outside McKinney's home. McKinney was arrested that day for hindering prosecution. (*See* Doc. 10-22 at 17). On March 8, 2000, an arrest warrant was issued for McKinney charging him with murder in violation of Alabama Code § 13A-6-2.[1] (*See* Doc. 10-22 at 18; Doc. 10-24 at 92). On November 1, 2001, a grand jury in Talladega County, Alabama, returned an indictment charging McKinney with the capital offense of murder of a person in a vehicle from outside the vehicle. (*See* Doc. 10-

---

[1] The warrant was not for the capital murder offense for which McKinney was indicted and convicted.

1 at 7; Doc. 10-22 at 19; Doc. 10-24 at 92).

The following is a summary[2] of the evidence presented at trial:

The State presented evidence that, on February 6, 2000, the victim, Stevelyn[n] Seals, went to Chris Gaddis' uncle's house to borrow Gaddis' uncle's truck and to get Gaddis to pick up a bed for her at Garrett Road. Gaddis testified that he went to the appellant's place on Garrett Road; that, when he arrived, the victim's teal green Honda Civic was in the driveway; that he and the victim went up the driveway toward the house on top of the hill, and he put the headboard and footboard of the bed in the truck; that the appellant subsequently drove an older model cream colored vehicle around his vehicle and to the foot of the hill, got out of the vehicle, and walked back up the hill; that the victim was standing in the door of her vehicle; that the appellant and the victim started arguing and cussing each other; that, at some point, the appellant reached behind his back, pulled out a gun, and pointed it at the victim; that the victim got back into her vehicle and rolled up the window; that the appellant looked back at him and told him to "get [his] punk ass out of there"; that, as he began to back up, he saw the appellant go to the side of the victim's vehicle and grab her window; that, when the appellant grabbed the window, it broke; that the appellant then reached into the victim's vehicle, grabbed her purse, and threw it over the victim's vehicle; that the appellant then gave the purse back to the victim; and that he subsequently stopped at the foot of the hill, put a bed rail in the truck, and left pretty quickly. (R. 1032.) He also testified that he did not notice that the hood of the victim's vehicle was scratched and that he did not remember any sort of discoloration or disfigurement on the hood of the victim's vehicle.

The State also presented evidence that, on the afternoon of February 6, 2000, Linda Blanchard Shierling and Jody Corbitt saw an older model pale yellow or cream-colored vehicle headed toward Sylacauga; that a man was driving the vehicle, and a woman appeared to be in the front passenger's seat of the vehicle; that the man was driving erratically; that the man and woman were struggling; and that it appeared that the man was either beating the woman or trying to hold her down in the passenger's seat.

Laura Dix testified that she was a registration clerk at Coosa Valley Medical Center on February 6, 2000; that, at some point, she saw the appellant pushing a wheelchair toward the emergency room; that the victim was in the wheelchair and was limp and slumped over; that the appellant told one of the nurses that the victim had been shot; that she asked the appellant if he knew the victim's name, and he said that he did not; that she asked the appellant if he knew the victim's birthday or anything, and he said that the victim's information was in her purse, which was in the vehicle; that the appellant left to move his vehicle and to get the victim's purse, but he never returned; and that the appellant did not tell her his name or give her any identification for himself or the victim.

---

[2] This summary is taken directly from the Court of Criminal Appeals memorandum opinion on direct appeal. (Doc. 10-22). The summary is quoted throughout McKinney's Rule 32 proceedings and has not been challenged by any of the parties as factually incorrect, misleading, or the like.

2

The State also presented evidence that Officer Willie Kidd of the Sylacauga Police Department stopped the appellant's vehicle a short distance from the hospital; that the appellant had blood on him; that law enforcement officers found a bullet that appeared to have tissue, blood, and hair on it in the appellant's pants pocket; and that there was blood inside and outside of the appellant's vehicle.

The State further presented evidence that law enforcement officers went to 539 Garrett Road, where they found the victim's vehicle; that the driver's side window of the vehicle was broken, and there was a bullet hole in the front windshield of the vehicle; that there was blood inside and outside of the vehicle; that there was a blood smear beside the front tag area; that there were fine scratches on the hood; that there was a spent projectile in the backseat behind the driver's seat and a piece of metal that appeared to be a bullet fragment in the front passenger's seat; that there was a spent shell casing about five feet from the vehicle's front bumper; that there was blood and glass in the appellant's driveway; and that there was a dented white bed rail across the street from the appellant's driveway on the shoulder of Garrett Road.

Larry Huys, a DNA analyst with the Alabama Department of Forensic Sciences ("the ADFS"), testified that he found blood stains that were consistent with the victim's genetic pattern on the appellant's shirt and pants, on a section of the appellant's passenger's side seat belt, on a soil sample that had been taken from the appellant's driveway, and on a swabbing that had been taken from the bullet that was found in the appellant's pocket; that the appellant was excluded as the source of the blood on those items; and that the source of the blood on those items was a female.

During a search at the house at 539 Garrett Road, law enforcement officers found an empty box for a Glock handgun on the front porch; another empty box for a Glock handgun in a cabinet inside of the residence; four nine-millimeter magazines—two of which were Glock magazines; a box of nine-millimeter ammunition and an empty nine-millimeter ammunition box; and a loaded Glock handgun under a pillow on the bed in the first bedroom.

Dr. Joseph Embry testified that he had been a forensic pathologist with the ADFS; that he autopsied the victim's body; that the victim had a gunshot wound going through her neck and upper back; that, based on the gunshot wound and injuries to the victim's face, hands, chest, and abdomen, it looked as if the bullet had hit something else before it hit the victim; that the exit wound was a shored wound, which indicated that the victim was leaning against a firm surface when the bullet passed through her skin; that there was a fairly prominent bruise under the victim's scalp over the superior temporal line that was about two and one-half inches in diameter; and that the victim's death was caused by a gunshot wound to the neck.

Mitch Rector testified that he was a firearms and toolmark examiner with the Birmingham Police Department; that he examined the victim's clothing; that he did not find any stippling on the victim's clothing, but he did find gunpowder debris

3

in a sweeping of the victim's sweatshirt; and that, in his experience, the farthest distance he had ever seen gunshot residue was between five and seven feet from the muzzle of the gun.

John Case, a trace evidence examiner with the ADFS, testified that he examined the victim's vehicle; that he did not find any white paint on the vehicle that matched the paint on the bed rail; that the scratched areas that he examined did not have white or any other foreign paint in them; that there was one blue smear and several black smears on the bed rail, but that there was not any green paint on it that was consistent with the paint on the victim's vehicle; and that the black paint samples that he had taken from the vehicle were not consistent with any of the smears or markings that were on the bed rail.

The appellant testified that he was a music producer and that the house at 539 Garrett Road was his studio; that he lived at a trailer located on the property; that, on the morning of February 6, 2000, he was in a meeting when the victim telephoned him about retrieving her bunk beds that were stored on the back porch of his studio; that he told the victim that he would not be able to do that at that point, and she hung up on him; that, because he realized that the victim had telephoned him from his trailer, he decided to go to the trailer and get the bed; that, when he arrived, the victim was parked in the driveway; that he told the victim that she would not be able to move the bed in her vehicle, and she left to get someone to help her move the bed; that he decided to move the pieces of the bed to the bottom of the hill; that he was carrying some of the bed rails down the hill when the victim returned in her vehicle; that he stopped and put the bed rails he was carrying down in the yard; that the victim got out of her vehicle, started cussing at him, and asked him about the pieces of the bed at the bottom of the hill; that Chris Gaddis drove up in a white truck and started loading the bed; that he and the victim were both cussing at each other; that, at some point, the victim leaned over into her vehicle, and, when she stood up, he saw that she was holding her purse; that he was afraid because he knew that the victim usually kept a gun in her purse and because the victim had told him about a previous incident in which she had shot another woman several times; that he pulled a gun out of his belt and told the victim and Gaddis that they needed to get off of his property; that the victim eventually got into her vehicle and threw her purse in the passenger's seat; that he put the gun away; that the victim closed the door of her vehicle and grabbed her purse; that he ran toward her window, stuck his body in the window, and grabbed the victim's purse; that the victim started rolling up the window; that he pulled himself out of the vehicle, and the window shattered; that he searched the victim's purse, but did not find a gun; that he threw the purse over the victim's vehicle; that he and the victim were cussing at each other about her broken window; that he went around the victim's vehicle, picked up the purse, gave it back to the victim, and told her that she needed to go; that, at some point, Gaddis got back into his truck and drove down the driveway; that he saw another piece of the bed rail and told the victim that he was going to put that piece down at the end of the driveway; that, as he was doing so, he heard the engine of the victim's vehicle revving and saw the victim driving right at him; that he threw the bed rail at the victim's vehicle and got out of the way; that the bed rail slammed onto the hood of the victim's vehicle, and the victim was upset

4

       because the hood of her vehicle was scratched; that he told the victim that she had to leave and pulled out his gun; that the victim started to drive slowly down the driveway, and he put his gun away; that he picked up the bed rail and started to walk down the driveway; that the victim backed up the hill past him and then drove toward him; that he jumped into a ditch, and the victim stopped; that he told the victim to leave and that he was going to telephone law enforcement authorities; that the victim drove down the driveway and turned left onto Garrett Road; that, because he thought the victim had left, he got out of the ditch and carried the bed rail down the driveway; that he saw that the victim had not left, but had parked on Garrett Road; that he took the bed rail to the other side of Garrett Road; that, as he came back across Garrett Road, the victim's reverse lights came on, and she started backing up; that he dove out of the way to avoid being hit; that the victim stopped, and he told her that he was going to telephone law enforcement authorities and that she was going to go back to jail; that he started to walk back up the driveway with his gun in his left hand; that he heard the sound of gravel, turned around, and saw the victim's vehicle coming toward him quickly; that he pointed the gun and fired one time; that the victim's vehicle hit him on his left leg, and he went over the edge of the hood of the vehicle; that he subsequently saw blood on the victim's hand; and that the victim told him that she had been shot. He also testified that he tried to take the victim to the hospital in her vehicle, but he was not good at driving a vehicle with a manual transmission; that he then went up the driveway, got his vehicle, drove back down the driveway, and got the victim; that he drove toward Sylacauga at a high rate of speed; and that, on the way to the hospital, the victim started to lose consciousness, and he tried to keep her from falling over in the vehicle. The appellant further testified that, when he got to the hospital, he went to the emergency room and got a wheelchair; that he took the victim out of the vehicle and put her in the wheelchair; that, as he was putting the victim in the wheelchair, he saw a metal fragment on the victim's sweatshirt, pulled it off, and put it into his pocket because he was in a hurry to get her inside; that he took the victim inside; that someone came up to him and started asking him for the victim's name, address, and other information; that he started answering her, but he did not know a lot of the information; that he subsequently had to move his vehicle because it had a gas leak; that, as he was driving to a gas station, he telephoned the victim's mother; that, while he was on the telephone with the victim's mother, Kidd stopped him; that Kidd asked him what had happened, and he told Kidd that he had found the victim on Garrett Road; and that he told Kidd that because he was afraid. Finally, he testified that, when he telephoned the victim's mother, he told her that the victim had been shot; that the victim's mother asked him if he had shot the victim; that he told the victim's mother that the victim had been shot by the person she had tried to run over with her vehicle; that the victim's mother told him that he was lying; and that he told the victim's mother that it was an accident.

(Doc. 10-22 at 2-8).

       On August 12, 2004, a jury sitting in Talladega County, Alabama found McKinney guilty of capital murder as defined by Alabama Code § 13A-5-40(17), which provides that "[m]urder

committed by or through the use of a deadly weapon while the victim is in a vehicle" is a capital offense. (Doc. 10-1 at 12).

McKinney filed a motion for a new trial on September 2, 2004. (Doc. 10-4 at 46-65). The primary basis for the motion for a new trial was the discovery of new evidence in the form of a blue piece of fabric with apparent blood stains on it. (*Id.*). After his trial, members of McKinney's family found a piece of fabric that had been with his personal belongings in the Talladega County jail. (*Id.* at 48-49). The fabric appeared to have been cut or torn from the pants McKinney was wearing on the day of the shooting. (*Id.*). In his motion for a new trial, McKinney argued that "had this cutting been made available and tested as order[ed] by this Court, presumably the outcome could have been different." (*Id.* at 49). He contended that if "the blood on the untested cloth torn from Defendant's pants is Defendant's blood, it would give credence to his testimony that he was struck by the vehicle driven by the deceased." (*Id.*). He further stated that "the location of the cloth removed from the pants is consistent with the height of the bumper of the vehicle; consistent with [the] height of the blood stain on the front of the vehicle, the same blood that was not tested; and consistent with the injury the Defendant had treated while in the Talladega County Jail." (*Id.*).

On September 24, 2004, the trial court sentenced McKinney to life without the possibility of parole, and McKinney filed a notice of appeal on the same day.³ (Doc. 10-4 at 66-68, 74). The court held a hearing on the motion for a new trial immediately after sentencing (*see* Doc. 10-24 at 120) and denied the motion for a new trial on October 6, 2004. (Doc. 10-24 at 119-23). McKinney filed an amended notice of appeal on October 12, 2014. (*Id.*).

---

³ The Answer in this case states that McKinney filed a notice of appeal on September 4, 2004. (Doc. 10 at 2). But the Answer's citation to the record does not support this statement, and the court cannot find a notice of appeal in the record for that date. Instead, the notice of appeal is dated September 24, 2004. (Doc. 10-4 at 74). The date of McKinney's notice of appeal on direct review is of no consequence to the outcome of this opinion.

On August 19, 2005, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming McKinney's conviction. (Doc. 10-22 at 2-30). McKinney filed an application for rehearing in the Alabama Court of Criminal Appeals on September 2, 2005, which was denied on September 9, 2005. (Doc. 10 at 5).[4] There is no record of a petition for writ of certiorari review filed in the Alabama Supreme Court. The Alabama Court of Criminal Appeals issued the certificate of final judgment on September 27, 2005. (Doc. 10-23 at 2).

### B. Rule 32 Proceeding

On February 13, 2006, McKinney filed his first post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Talladega County. (Doc. 10-24 at 10-35). On April 13, 2007, McKinney filed a motion requesting production of the DNA testing from the cloth patch cut from his pants. (Doc. 10-24 at 69-70). That motion was granted, and on July 19, 2007, McKinney filed an amendment to his Rule 32 petition. (Doc. 10-24 at 75-80).

The trial court held two evidentiary hearings on the Rule 32 petition. The first occurred on July 24, 2007 (Doc. 10-26 at 34-179; Doc. 10-27 at 1-53), and the second on January 29, 2008. (Doc. 10-25 at 17-136). On July 29, 2008, the trial court denied McKinney's Rule 32 petition. (Doc. 10-24 at 88-123).

On August 11, 2008, McKinney filed a notice of appeal. (Doc. 10-24 at 124). The Alabama Court of Criminal Appeals issued a memorandum opinion affirming the denial of his Rule 32 petition on May 29, 2009. (Doc. 10-30 at 2-21). One judge dissented from the denial. (Doc. 10-31 at 2-17). There is no record of a timely filed a petition for writ of certiorari in the Alabama Supreme Court. The Alabama Court of Criminal Appeals issued a certificate of judgment

---

[4] The court could not find these documents in the record and Respondents' brief does not provide a citation for these filings. That being said, the court has independently verified through online court records via www.alacourt.com that these dates are correct. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 652-53 (11th Cir. 2020) (holding that the district court may take judicial notice of its own records and those of state-court proceedings).

7

on June 17, 2009.  (Doc. 10-32).

On October 7, 2015, McKinney apparently mailed a motion to compel to the Alabama Supreme Court and the Alabama Attorney General requesting "any confirmation of 'Final Judgment' from the Supreme Court, or if any Writ of Certiorari has been filed by Petitioner Trial Counsel" regarding his Rule 32 petition.  (Doc. 10-33 at 2-3).  There is no record that the Supreme Court received McKinney's request or that the Supreme Court responded to McKinney.[5]  On October 22, 2015, McKinney apparently mailed a petition for writ of certiorari challenging the May 29, 2009 affirmance of the denial of his Rule 32 petition to the Alabama Supreme Court and the Alabama Attorney General.  (Doc. 10-34 at 2-12).  There is no record that the Supreme Court received the petition.[6]

On April 7, 2016, McKinney filed a second Rule 32 petition challenging his conviction.  (Doc. 10-35 at 8-68).  The Circuit Court held a hearing on the second petition on July 27, 2016.  (Doc. 10-37 at 76-102; Doc. 10-38 at 2-72).  On July 28, 2016, the court denied McKinney's second Rule 32 petition.  (Doc. 10-37 at 5-8).  McKinney appealed the denial to the Alabama Court of Criminal Appeals on October 16, 2016 (Doc. 10-40 at 2-48), and the Alabama Court of Criminal Appeals affirmed the denial on February 3, 2017.  (Doc. 10-42 at 2-5).  On March 3, 2017, McKinney filed a petition for writ of certiorari in the Alabama Supreme Court.  (Doc. 10-43 at 2-18).  The Alabama Supreme Court denied his petition on April 14, 2017, and issued a certificate of judgment.  (Doc. 10-44 at 2).

---

[5] The envelope attached to the motion in the record is addressed to the State of Alabama, Office of Attorney General.  (Doc. 10-33 at 5).  The court scoured the record for a filed copy of the motion, but did not find one.  The court also conducted an independent review of the docket in the online court records and did not find any indication of the filing of this motion.

[6] Again, the envelope attached to the petition is addressed to the State of Alabama, Office of Attorney General.  (Doc. 10-34 at 12).  The court conducted the same search with regard to the motion to compel and similarly could not locate any evidence of the filing of this petition in the Alabama Supreme Court.

### C. Federal Habeas Petition

McKinney filed the instant petition on April 28, 2017.[7] (Doc. 1). He asserts the following grounds for relief:

> (1) "Fundamental miscarriage of justice" in that the "[t]rial court neglected to accept a self-defense claim when presented with evidence to substantiate such, show[s] a fundamental miscarriage of justice against someone who is actually innocent";
>
> (2) due process violation when the circuit court waived his preliminary hearing without his consent;
>
> (3) due process violation for failing to conduct a mental evaluation;
>
> (4) "suppression of exculpatory and impeachment evidence"; and
>
> (5) prosecutorial misconduct.

(Doc. 1 at 5-18).

## II.     DISCUSSION

Respondents argue that McKinney's petition is untimely and his claims are procedurally defaulted.[8] (Doc. 10). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides a one-year statute of limitations for filing a § 2254 petition. 28 U.S.C. § 2244(d)(1). The limitations period runs from the latest of the following:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court

---

[7] A *pro se* inmate's petition is deemed to have been filed on the date it is delivered to prison officials for mailing. *See Houston v. Lack*, 487 U.S. 266, 275-76 (1988); *Adams v. United States*, 173 F.3d 1339, 1341 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780-82 (11th Cir. 1993). Although the court's docket sheet indicates that the petition was filed on May 3, 2017, McKinney dated his petition on April 28, 2017. (Doc. 1 at 16).

[8] Because the court concludes that the petition is due to be dismissed as untimely, it will not address Respondents' argument that Petitioner's claims are procedurally defaulted.

   and made retroactively applicable to cases on collateral review; or

   (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id*. McKinney does not allege any facts implicating § 2244(d)(1)(B), (C), or (D). So, the limitations period began to run from the date McKinney's convictions became final upon the conclusion of direct review or the expiration of time for seeking that review. *See* 28 U.S.C. § 2244(d)(1)(A).

  Where, as here, a state prisoner appeals his conviction to the Alabama Court of Criminal Appeals, but does not seek review in the Alabama Supreme Court, his conviction becomes final for purposes of § 2244(d)(1)(A) on the date his time for seeking that review expires. *See Gonzalez v. Thaler*, 565 U.S. 134, 137, 149-54 (2012). The Alabama Court of Criminal Appeals affirmed McKinney's conviction on August 19, 2005. (Doc. 10-22 at 2-30). McKinney filed an application for rehearing in the Alabama Court of Criminal Appeals on September 2, 2005, which was denied on September 9, 2005. (Doc. 10 at 5). McKinney did not file a petition for writ of certiorari review in the Alabama Supreme Court. The Alabama Court of Criminal Appeals issued a certificate of judgment on September 27, 2005.

  The first day the limitations period began to run on the instant petition was the day after the certificate of judgment—September 28, 2005. *See San Martin v. McNeil*, 633 F.3d 1257, 1266 (11th Cir. 2011) (holding that the day after the event marking finality is the first day of AEDPA's one-year limitation period because Rule 6(a)(1) of the Federal Rules of Civil Procedure requires the day of the event that triggers a time period to be excluded from its computation). Therefore, September 28, 2006 was the final day of the limitations period, *see Downs v. McNeil*, 520 F.3d 1311, 1318 (11th Cir. 2008) (noting that the "limitations period expires on the anniversary of the date it began to run"), and McKinney had until that date to seek federal habeas relief, absent statutory or equitable tolling. *See Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008) (holding

10

that a statute of limitations may be tolled statutorily or equitably). McKinney did not file his federal habeas petition until April 28, 2017. (Doc. 1). On its face, his petition is untimely unless statutory or equitable tolling[9] applies.

### A. Statutory Tolling

Section 2244(d)(2) tolls the one-year limitation period during the pendency of "a properly filed application for [s]tate post-conviction or other collateral review" of the underlying judgment. 28 U.S.C. § 2244(d)(2); *see also McCloud*, 560 F.3d at 1227; *Cramer v. Sec'y, Dept. of Corr.*, 461 F.3d 1380, 1383 (11th Cir. 2006). "However, the pendency of even a properly filed state post-conviction proceeding only *pauses* § 2244(d)(1)'s one-year clock; it does not *reset* it." *Roby v. Mitchem*, 2012 WL 1745529 at *3 (N.D. Ala. May 1, 2012).

Here, the limitations period ran for 138 days (from September 28, 2005 until February 13, 2006) when McKinney filed his first Rule 32 petition. (Doc. 10-24 at 10-35). The limitations period remained tolled until June 17, 2009, when the Alabama Court of Criminal Appeals issued the certificate of final judgment. (Doc. 10-32). Accordingly, McKinney had 227 days remaining (or until February 1, 2010[10]) to file a federal habeas petition. McKinney did not file his petition until April 28, 2017, more than six years later. McKinney's second Rule 32 petition did not toll the statute of limitations because it was filed on April 6, 2016, long after the limitations period expired. For these reasons, McKinney's federal habeas petition is barred by the statute of

---

[9] Equitable tolling is "an extraordinary remedy which is . . . applied sparingly" and "is limited to rare and exceptional circumstances." *Lawrence v. Florida*, 421 F.3d 1221, 1226 (11th Cir. 2005), *aff'd*, 549 U.S. 327 (2007). "The petitioner bears the burden of showing that equitable tolling is warranted." *Hunter v. Ferrell*, 587 F.3d 1304, 1308 (11th Cir. 2009). Specifically, a petitioner must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks omitted); *see also Helton v. Sec'y for Dept. of Corr.*, 259 F.3d 1310, 1312 (11th Cir. 2001). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Holland*, 560 U.S. at 653 (internal quotation marks and citation omitted). A petitioner also must "show a causal connection between the alleged extraordinary circumstances and the late filing of the petition." *San Martin*, 633 F.3d at 1267. McKinney does not present any argument that entitles him to equitable tolling. (*See* Docs. 1 & 14).

[10] The actual deadline was January 30, 2010, but that date fell on a Saturday, so the deadline was automatically extended to Monday, February 1, 2010. *See* Fed.R.Civ.P. 6(a)(1)(C).

11

limitations unless he can establish his actual innocence of the underlying offense.

      **B.**      **Actual Innocence**

The United States Supreme Court has held that actual innocence, if proven, serves as a gateway allowing a habeas petitioner to overcome a procedural bar or the expiration of the statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). A successful actual-innocence gateway claim requires a petitioner to support his allegations of constitutional error "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Nevertheless, "tenable actual-innocence gateway pleas are rare: A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quotation marks omitted) (quoting *Schlup*, 513 U.S. at 329). In making this determination, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 537 (2006) (internal quotation marks omitted).

Construing McKinney's petition liberally, he alleges that he is entitled to an actual-innocence exception to the statute of limitations. But his actual-innocence claim is not the usual kind. McKinney does not claim that someone else killed Seals. *See Sawyer v. Whitley*, 505 U.S. 333, 340 (1992) ("A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime."). Instead, McKinney contends that he is "innocent" of the crime of capital murder because he was acting in self-defense when he shot Seals. The court must initially determine whether a claim of this nature is within the purview of *Schlup*'s actual-innocence exception.

"[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). The Supreme Court has not decided whether a complete affirmative defense to a crime—such as insanity or self-defense—establishes factual innocence or merely legal innocence. The Eleventh Circuit also has not decided the issue,[11] and other circuit courts that have addressed it have reached different conclusions. The majority, however, of the circuit courts permit a claim of actual innocence based on new evidence of a complete affirmative defense. *See Jaramillo v. Stewart*, 340 F.3d 877, 883 (9th Cir. 2003) (concluding that new evidence showing petitioner acted in self-defense "corresponds with *Schlup*'s actual innocence requirement"); *Ellis v. Hargett*, 302 F.3d 1182, 1186 n.1 (10th Cir. 2002) (finding claim of actual innocence based on self-defense insufficient because it showed only that defendant was "legally innocent because his conduct is justified or mitigated by the doctrines of self-defense or heat of passion"); *Finley v. Johnson*, 243 F.3d 215, 221 (5th Cir. 2001) (concluding that an affirmative defense that "would result in defendant's acquittal constitutes a sufficient showing of 'actual innocence'"); *Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999) (holding that the defense of insanity renders a petitioner factually innocent rather than legally innocent, and therefore this affirmative defense is a cognizable actual innocence claim under *Schlup*); *see also Jones v. Delo*, 56 F.3d 878, 882-83 (8th Cir. 1995) (finding defaulted petitioner's claim of innocence is actual and not legal when the claim negates an essential element of a capital conviction). Absent

---

[11] That is not to say that the Eleventh Circuit has not been presented with the broader issue. In *Rozzelle v. Secretary, Florida Department of Corrections*, 672 F.3d 1000 (11th Cir. 2012), the Eleventh Circuit discussed the legal issue in detail, but ultimately decided the appeal with a narrower holding:

> Today, we need not decide whether *Schlup* permits a claim of actual innocence based on "new reliable" evidence of a complete affirmative defense that renders the conduct of conviction wholly noncriminal and requires acquittal. Nor need we address essential elements of capital crimes. Rather, we decide only that the narrow and extraordinary nature of *Schlup*'s actual innocence "gateway" does not extend to petitioners, like Rozzelle, who did the killing and whose alleged "actual innocence" of a non-capital homicide conviction is premised on being guilty of only a lesser degree of homicide.

*Id*. at 1015 (citations omitted).

guidance from the Eleventh Circuit, this court presumes it would follow the Fifth, Seventh, Eighth, and Ninth Circuits and evaluate McKinney's argument that he can show actual innocence under *Schlup* based on the new evidence relating to his affirmative defense of self-defense.

### 1. Underlying Facts

In order to evaluate McKinney's claim of actual innocence, the court must discuss his proffered new evidence and the facts surrounding it. *See House*, 547 U.S. at 537. The court outlines those facts below, keeping in mind the evidence presented at trial, summarized above.

On February 6, 2000, the date of the shooting, McKinney was arrested, and at 5:50 p.m. he gave his clothes to Captain Jimmy Kilgore of the Talladega County Sheriff's Department. It is undisputed that at that time, his pants were fully intact. (Doc. 10-31 at 11). A few hours later, at 7:56 p.m., Sergeant Rumbl of the Sheriff's Department placed a piece of blue cloth—cloth apparently taken from the bottom of McKinney's left pants leg—in an envelope containing McKinney's personal property. The "inmate personal property" form noted "(1) piece Blue cloth" as an item in the envelope. (Doc. 10-4 at 52). This envelope was sealed and kept in the custody and control of the Talladega County Sheriff's Department until after McKinney's trial. McKinney did not sign an inventory receipt, and the blank space for a signature on the envelope is not signed. (*Id*.). A jail official testified at the hearing on McKinney's motion for a new trial that he did not know why McKinney did not sign the envelope consistent with usual procedures. (Doc. 10-31 at 12). There is no evidence that the district attorney knew about the piece of cloth that was preserved with McKinney's personal belongings. (Doc. 10-31 at 11).

The pants, except for the portion cut off the cuff, were kept as evidence in the case. McKinney and his counsel viewed and inspected the pants on numerous occasions. The pants were initially examined by Larry Huys of the Alabama Department of Forensic Sciences, and he issued his report on August 21, 2001. (Doc. 10-4 at 53-56). Nothing in that report noted a defect

14

to the pants,[12] but it did note that the stains on the pants "exhibited a positive reaction when tested for a component of blood." (*Id.*). No DNA analysis was performed on McKinney's pants at that time. (*Id.*).

On March 3, 2003, the assistant district attorney sent a response to McKinney's counsel regarding various items of evidence. (Doc. 10-4 at 11-21). The portion of the letter addressing McKinney's pants states: "Reports of cuttings from McKinney's pants or blood analysis. Mr. McKinney's entire pants were submitted to the Department of Forensic Sciences for analysis." (*Id.* at 13). The letter then referenced the August 21, 2001 report by Larry Huys. (*Id.*).

Upon motion from McKinney, on March 20, 2003, the trial court ordered the district attorney to send "the pants of the Defendant, and any cuttings from the pants of the Defendant," to Larry Huys at the Department of Forensic Sciences "to compare any blood that might be on the pants or cuttings to the known blood of Defendant, Destry McKinney." (Doc. 10-4 at 57-58). The August 18, 2003 report from this second round of testing clearly noted that the pair of blue pants was received with a "large defect in the left leg at cuff area." (Doc. 10-4 at 60). The report did not list any cuttings from the pants as items submitted for testing.[13] (*Id.*). The report concluded that the blood stains on the pants were not from McKinney, but were consistent with the genetic characteristics of the victim. (Doc. 10-4 at 61).

The blood stains on the piece of cloth cut from McKinney's pants were finally tested in February 2007 during the pendency of his Rule 32 proceeding. (*See* Doc. 10-24 at 69-70). In his February 6, 2007 report, Huys stated that the stain on the piece of cloth was a mixture of blood

---

[12] At the hearing on the motion for a new trial, Huys testified that he noted there was a defect in the lower left cuff area of the pants and that material was missing at the time of his examination. (Doc. 10-30 at 18). His report, however, did not include this notation. (Doc. 10-4 at 53-56).

[13] Despite this, at one of the Rule 32 hearings, McKinney's attorneys testified that they knew that a part of the pants had been cut, but it was their understanding that the cutting was with the pants, that everything had been tested, and that none of the blood on the pants was McKinney's blood. (Doc. 10-30 at 18).

from at least two individuals, with one individual being male. (Doc. 10-30 at 19). The report concluded that McKinney "could be the contributor of the minor component found in the stain on the cloth."[14] (*Id.*).

### 2. *Analysis Under Schlup*

As discussed above, overcoming the bar to defaulted constitutional claims requires a showing of "new reliable evidence . . . not presented at trial." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324). To pass through the *Schlup* gateway, a petitioner must show that it is more likely than not that no reasonable juror could have convicted him if the "new evidence" had been presented. *Schlup*, 513 U.S. at 327. This new evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See Sibley v. Culliver*, 377 F.3d 1196, 1207 (11th Cir. 2004) (concluding that even if new evidence showed that the murder victim was the aggressor, "a reasonable juror could still quite possibly have concluded that [petitioner] acted with murderous intent, rather than out of self-defense"). To be clear, however, the petitioner must show that in light of all the available evidence, no reasonable juror could convict him of the relevant crime. *House*, 547 U.S. at 537. So, the new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial" such that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted). The "new evidence" presented by McKinney falls far short of meeting this demanding standard.

McKinney testified at trial that he acted in self-defense when he shot and killed Seals. Specifically, McKinney testified that he shot his gun at Seals as she struck him with her car. While the new evidence relating to the blood on McKinney's pants generally supports his testimony, the

---

[14] In its Rule 32 opinion, the trial court found that "[t]he blood on the [cutting from the] pants was subsequently tested and was that of the Defendant." (Doc. 10-24 at 113). The majority opinion from the Court of Criminal Appeals highlights the discrepancy between the February 6, 2007 report and this finding. (Doc. 10-30 at 19).

16

problem for McKinney is that mere support is not enough. *See Sibley*, 377 F.3d at 1207; *Rozzelle*, 672 F.3d at 1017 (finding evidence insufficient to show actual innocence because "largely cumulative of what the jury heard"). The new evidence is a piece of circumstantial evidence that supports McKinney's testimony that Seals hit him with her car. But, the jury heard other evidence that supported this testimony, including a photograph reflecting a stain consistent with blood on the front portion of the car driven by Seals and testimony that McKinney had an injury to his left leg when he was arrested and taken to the Talladega County Jail.[15] While the new evidence may be an additional layer of evidentiary support for an inference of self-defense, in the broader context of the trial evidence, it is best characterized as cumulative of the evidence that was presented to the jury. Properly framed, then, this court cannot say that the new evidence is so significant that it undermines confidence in the jury's verdict, or that it makes it more likely than not that no reasonable juror would have convicted him if the evidence was presented.

Simply put, in light of the evidence discussed in detail above, McKinney has failed to carry his burden of proving that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. McKinney thus has failed to make a gateway showing of actual innocence, and there is no basis for concluding that his constitutional claims are not time barred.

## III.   CONCLUSION

Based on the foregoing, the petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by McKinney is due to be denied. Because the petition does not present issues that are debatable among jurists of reason, a certificate of appealability also is due to be denied. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner

---

[15] Even if the jury believed that Seals struck McKinney with her car at some point during the encounter, this fact alone does not necessitate a finding of self-defense.

must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). In the circumstances presented here, a certificate of appealability is not warranted.

    A separate order will be entered.

    **DONE** and **ORDERED** this August 6, 2020.

                                              **R. DAVID PROCTOR**
                                              UNITED STATES DISTRICT JUDGE